**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

CAROL A. HOFF                                   :          CIVIL ACTION
                                                :
            v.                                  :
                                                :
MICHAEL J. ASTRUE,                              :          NO. 08-cv-00218
COMMISSIONER OF THE                             :
SOCIAL SECURITY ADMINISTRATION_____:


**MEMORANDUM RE:  SOCIAL SECURITY APPEAL**


**Baylson, J.**                                            **January 29, 2009**

        Plaintiff, Carol A. Hoff ("Hoff," "Plaintiff") seeks judicial review of the decision of the

Commissioner of the Social Security Administration ("Commissioner," "Defendant") denying

her application for disability insurance benefits under Title II of the Social Security Act ("the

Act"), 42 U.S.C. §§ 1381-1383(c) (2000).  Jurisdiction is established under § 405(g) of the Act.

42 U.S.C. § 405(g).  For the reasons that follow, the Court will GRANT Plaintiff's Motion for

Summary Judgment, REVERSE the decision of the Commissioner, and AWARD benefits to

Plaintiff.

I.      **Background and Procedural History**

        **A.____Procedural History**

        Plaintiff is a 60 year-old female who can communicate in English and has completed the

tenth grade.  (R. 58, 75, 82).  Under the Commissioner's regulations, Plaintiff is currently

classified as a person of "advanced age," though at the time her application was filed in 2000

Plaintiff was considered a "person closely approaching advanced age," at age 52.  20 C.F.R. §§ 404.1563, 416.963 (2008).

Plaintiff protectively filed an application for disability insurance benefits on November 2, 2000.[1]  (R. 58).  Plaintiff's application was initially denied by the Commissioner on February 5, 2001.  (R. 25).  Plaintiff, represented at the time, filed a timely request for a hearing before an Administrative Law Judge (hereinafter "ALJ") on February 15, 2001.  (R. 29).  After a hearing was held on August 22, 2002 (R. 1486-1512), ALJ Paula Garrety denied Hoff's application on October 24, 2002, finding that Hoff was not disabled given that she could still perform the duties of her prior employment.  (R. 19).  She first found, after considering the medical evidence and Hoff's allegations, that Hoff had the impairments of fibromyalgia, degenerative disc disease involving the lumbar and cervical spine, a frozen right shoulder, anxiety, and depression.  (R. 17).  However, the ALJ determined, while Hoff's impairments did not amount to a per se disability, they did limit her to the residual functional capacity of being able to

> lift or carry objects weighing up to ten pounds and to stand or walk for at least six hours in an eight hour workday.  She would not be able to use her right upper extremity for activities which require over the shoulder reaching or handling, and she would be limited to unskilled work.  In reaching this assessment of claimant's functional capacity, the [ALJ] finds claimant's testimony to be generally credible but inconsistent with wholly work-preclusive functional limitations.  Although claimant has testified to disabling levels of pain and fatigue, she has remained very active despite her impairments.

---

[1] Plaintiff filed a prior application for disability insurance benefits under Title II of the Social Security Act on August 26, 1992, alleging that she was disabled beginning on May 14, 1992.  (R. 16).  That application was denied by the Commissioner after a decision of an Administrative Law Judge, and the Appeals Council denied her request for further review.  (R. 16).

(R. 18).  Regarding Hoff's mental impairments, the ALJ found that they only mildly interfered with her activities of daily living and social functioning and that they mildly to moderately interfered with her ability to maintain concentration, persistence, or pace; these mental impairments were therefore "consistent with an ability to meet the mental demands of unskilled work."  (R. 18).  With the vocational expert's conclusion that jobs were available in the economy in significant numbers given the tailored hypothetical considering Hoff's age, education, work history, and residual functional capacity, the ALJ found that Hoff was not disabled since she could still perform her past positions of hall monitor and lunch monitor, two positions that the vocational expert identified in response to the hypothetical, as well as other light unskilled work. (R. 19).

The Appeals Council subsequently affirmed the decision of the ALJ after finding that there was no reason to review the opinion.  (R. 5).  In response, Hoff again sought review of the decision by filing a complaint in this court.  On September 21, 2005, Judge Green, after considering the medical evidence, the transcript of the hearing, and the ALJ's opinion, remanded the case for a rehearing.  (R. 1563).  In particular, Judge Green held that the ALJ erred by not including Hoff's recognized mental impairments in the hypothetical given to the vocational expert at the hearing.  (Id.)

Upon remand, another hearing was held by ALJ Garrety on April 5, 2006.  (R. 1786).  At the hearing, the ALJ again presented a vocational expert with a hypothetical tailored for Hoff and also instructed the expert to confine his opinion to "simple routine, one to two step tasks because of diminished capacity for concentration, persistence, and pace.  Therefore, the work should be unskilled in nature."  (R. 1794).  In response to the hypothetical, the vocational expert identified

the positions of a packer, a general office clerk, and a sorter.  (R. 1795).  On May 22, 2006, ALJ

Garrety rendered her decision, again finding Hoff not to be disabled up to the date where her

insurance ended, December 31, 2000.  (R. 1521, 1522).  After adopting the analysis of her prior

opinion except where inconsistent (R. 1521), the ALJ again concluded that Hoff had the severe

impairments of fibromyalgia, degenerative disc disease involving the cervical and lumbar spine,

a frozen right shoulder, anxiety, and depression.  (R. 1524).  Given these impairments, ALJ

Garrety determined that Hoff had the residual functional capacity "to perform a range of

unskilled, light exertion work, which involves lifting/carrying up to 10 pounds, standing/walking

up to 6 hours in an 8-hour day, and the performance of simple and routine tasks[, and the

claimant] is also unable to use her right upper extremity for over the shoulder reaching or

handling."  (R. 1524).  On the basis of this residual functional capacity and Hoff's age,

education, and work experience, the ALJ concluded that there were jobs in significant numbers

in the economy that Hoff could perform; therefore, Hoff was not disabled for purposes of social

security disability insurance.  (R. 1525-26).

     Plaintiff filed a timely appeal with the Appeals Council on June 21, 2006.  (R. 1516-17).

On November 30, 2007, the Appeals Council notified Plaintiff that it would not assume

jurisdiction over the ALJ's opinion, thereby finalizing the Commissioner's denial of the claim.

(R. 1513-15).  Plaintiff subsequently filed a complaint in this Court seeking judicial review of the

Commissioner's decision on February 19, 2008.  Plaintiff filed this Motion for Summary

Judgment (Doc. No. 8) on the appeal, which is presently before this Court.

     **B.**    **Plaintiff's Work History**

From 1983 through 1999, Plaintiff has worked in several different positions.  First, from 1983 through 1985, Plaintiff was employed by a catering company as a waitress.  (R. 68, 93, 95).  Next, from 1987 through 1993, Plaintiff was employed as a custodian, a lunch room monitor, and a hall monitor with Bristol School District.  (R. 68, 93, 96-98).  Finally, from 1997 through 1999, Plaintiff was employed with a retirement home as a resident assistant.  (R. 69, 93, 94).

It is important to note that Plaintiff alleges her disability began on July 15, 1999.  (R. 58).  As the ALJ recognized in both of her opinions, "[e]arnings records maintained by the Social Security Administration show that the claimant met the disability insured status requirements of the Social Security Act on July 15, 1999 and that she has acquired sufficient quarters of coverage to remain insured only through December 31, 2000."  (R. 16-17).  Neither Party disputes this conclusion.  As such, the relevant analysis must be limited to the time between July 15, 1999 and December 31, 2000.

### C.    Plaintiff's Medical Conditions and Treatment

While Plaintiff's initial application for disability insurance did not specifically identify those impairments which she claims established her disability (R. 76), the ALJ identified the following undisputed impairments: fibromyalgia, degenerative disc disease, involving the lumbar and cervical spine, a frozen right shoulder, anxiety, and depression.  (R. 17, 1524).  The record in this case is 1,800 pages, including a voluminous medical history with some records pre-dating Plaintiff's benefit eligibility period.  As such, the Court will only consider those conditions and injuries for which Plaintiff was treated during the period for which she is eligible for benefits.  Plaintiff's family doctor at the time appears to be Dr. Cecilia Roman.  (R. 114, 585.)

Plaintiff's alleged disability onset stems from an assault she experienced at work on May 9, 1999. (R. 17.) She was walking down the hall of the retirement home where she worked when a patient punched her in the face and knocked her down, causing her to fall on her right shoulder. (R. 1770.) Plaintiff went to the emergency room as a result of the accident and was released later that day. (R. 1024-26.) For her resulting injuries, including facial contusion, shoulder sprain, and headaches and dizziness, Plaintiff was initially treated by Dr. Axelrod, a workers' compensation doctor. (R. 510-12.) Plaintiff received workers' compensation for her injury. (R. 1491.)

Plaintiff continued to experience significant shoulder pain following the accident and Dr. Axelrod referred her to Dr. Stollsteimer, an orthopedic surgeon. (R. 1080-96.) An MRI performed June 2, 1999 showed subacromial enthesophyte and SLAP lesion. (R. 1145.) On July 15, 1999, she underwent shoulder arthroscopy and repair of the anterior labral tear. (R. 731.) However, Plaintiff continued to experience shoulder pain and rapid loss of motion in that shoulder following the surgery. (R. 1143-44, 1771.) At some point after the operation she began holding her right (dominant) hand in a clenched, fist-like position and continued to do so through at least 2006. (R. 1703, 1792.)

In August 1999, Plaintiff began seeing Dr. O'Brien for physical therapy. On her initial visit, the Doctor noted that Plaintiff had shoulder, back, neck, and knee pain, plus spasms in her cervical spine and trigger points. (R. 1338-39.) Plaintiff had a decreased range of motion in her right shoulder and decreased sensation in both hands. (R. 1339.) O'Brien diagnosed Plaintiff with a right shoulder injury, cervical strain and sprain, and bilateral knee injury. (R. 1157, 1340.) In addition, he referred Plaintiff to Dr. Landes, a psychologist, for her flattened affect. (R. 1343.)

Dr. O'Brien continued to treat patient through July 2000 with visits usually occurring three times per week.  (R. 757-891; 1157-1246; 1388.)  On November 23, 1999, Dr. O'Brien wrote a letter stating that Plaintiff could not return to work as a rebuttal to Dr. Stollsteimer's recent return to work note, which is discussed infra.  (R. 1160.)  Dr. O'Brien stated that he believed Dr. Stollsteimer was not aware of Plaintiff's panic attacks and anxiety related to her work-related accident.  He also noted: "The frozen right shoulder, which was caused because of Dr. Stollsteimer's mismanagement status post surgery, is still being treated and may need to be fixed with manipulation under general anesthesia."  (Id.)  In addition, on a form asking if Plaintiff could return to her pre-injury job without restrictions, Dr. O'Brien consistently responded "No" from September 1999 through September 2000.  (R. 528-40.)

Due to her complaints of knee pain, Plaintiff had an MRI performed on her knees in October and November 1999.  (R. 1146-47.)  The results showed an oblique tear of the posterior medial meniscus with joint effusion, associated mild degenerative changes of the medial joint space, and probable post-surgical change of the anterior horn and body of the medial meniscus in the left knee.  (Id.)  The right knee showed mild degenerative change of medial and patellofemoral join spaces with small joint effusion and mild medial meniscus degeneration with no frank tear.  (Id.)

Dr. Landes began treating Plaintiff for the psychological repercussions of her assault at work beginning in August 1999.  (R. 909, 914, 1282.)  Landes diagnosed Plaintiff with "Pain Disorder Associated with General Medical condition Adjustment Disorder with Depression and Anxiety."  (R. 918.)  Dr. Landes described Plaintiff as suffering from severe depression, anxiety, panic attacks, sleep disturbance, difficulty functioning, social anxiety, fear of going outside, and

difficulty participating in church, which she enjoyed prior to the incident.  (R. 914.)  Landes

stated in a report on December 1, 1999, that Plaintiff "spends much of her time in pain with

reduced capabilities on all levels."  (Id.)  In that same report, Landes stated that Plaintiff would

be "unable to function on a job, even in light duty. . . .  At the current time she is fully disabled

from working in any capacity."  (Id.)  In addition, Plaintiff expressed suicidal thoughts to Landes.

(R. 1435.)  Landes continued to treat Plaintiff through at least April 2002.  (Id.)

 In an Assessment of Mental Ability to do Work-Related Activity,[2] Dr. Landes noted

"marked" to "extreme" limitations in Plaintiff's ability to relate to a job, including tasks such as

"follow rules," "use judgment," and "maintain attention / concentration."  (R. 1478.)  Dr. Landes

further stated, "If the individual were placed in any type of work setting, she would

decompensate psychologically.  She is unable to handle any type of stress or pressure and would

be unable to consistently follow through in any type of task." (R. 1480.)

 In September 1999, Plaintiff saw Dr. Nemiroff for pain, described as constant headache,

neck pain, and severe right arm lancinating pain.  (R. 1101.)  Dr. Nemiroff noted her "markedly

decreased range of motion of the right upper extremity and shoulder, and [ ] contracture of the

fingers in the right hand, as well."  (Id.)  Nemiroff's medical impression of Plaintiff was "chronic

right shoulder and neck pain, with possible RSD of the right upper extremity."  (R. 1102.)  He

prescribed medication and local injections into the sympathetic nerve tissue.  (Id.)

 Beginning in September 1999, Plaintiff also saw Dr. Pearlstein, a neurologist, for neck

pain and arm paralysis.  (R. 907.)  At that time he diagnosed mild right carpal tunnel syndrome.

---

[2]The Assessment was completed December 26, 2002 but Dr. Landes stated that it was based on her treatment notes and records for August 24, 1999 until December 19, 2000.  (R. 1480.)

(R. 907.)  In January 2000, he summarized her condition as "persistent symptoms of post-concussion syndrome and a report of cervical disc disease although her EMG and nerve conduction study was unremarkable."  (R. 1144.)  Pearlstein "suspect[ed] that she is having intermittent cervical radiculopathies and has a chronic pain syndrome."  (R. 902.)

An MRI was performed on Plaintiff's lumbar spine in May 2000.  (R. 442.)  It revealed a diffuse disc bulging with a superimposed small, central disc herniation that indented the ventral thecal sac at L4-5.  (Id.)  In addition, there was a tiny, central disc herniation at L5-S1.  (Id.)  However, there was no significant central canal or foraminal stenosis.  (Id.)

Beginning May 30, 2000, Plaintiff began seeing Dr. Witkin, an orthopedic surgeon, for severe right shoulder and neck pain.  (R. 981.)  In July 2000, Dr. Witkin ordered an MRI of Plaintiff's cervical spine.  (R. 971.)  The results of the MRI were as follows: "Mild disc bulge and spurring midline and towards the right side at C3-C4 with mild impression on the thecal sac.  Minimal spurring at C4-C5.  Mild to moderate diffuse disc bulge and spurring at C5-C6 with mild impression on the spinal cord and mild spinal stenosis."  (R. 971-72.)

In June 2000, Plaintiff saw Dr. Thanki, a neurosurgeon, for headaches, neck pain, muscle pain, and other issues.  (R. 1067.)  His impression was as follows: herniated cervical disc at C3-4 and C5-6; post-traumatic headaches, neck pain and pain in both upper extremities; post-traumatic pain in mid back, low back, and both lower extremities; a history of previous injuries; and significant atrophy in right upper extremity.  (R. 1070.)

In September 2000, Plaintiff began seeing Dr. Katz to treat her pain.  (R. 1418.)  In his initial analysis, he stated that Plaintiff's multiple complaints made a unifying diagnosis difficult.  (R. 1419.)  He noted that she did not "exhibit all of the necessary myofascial tender points to

quite confirm a diagnosis of fibromyalgia." (Id.) However she had severe problems with painful legs and severe weakness as well as some walking difficulty and slurred speech. (Id.) Dr. Katz treated Plaintiff with medication and trigger point injections regularly through 2002. (R. 1418-34, 1636, 1641-51.) Katz later diagnosed Plaintiff with fibromyalgia dating back to the beginning of his treatment. (R. 1636.)

## II.   Jurisdiction and Standard of Review

The Social Security Act provides for judicial review by this Court of any "final decision of the Commissioner of Social Security" in a disability proceeding. 42 U.S.C. § 405(g) (2000). A district court may enter a judgment "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." Id.

On judicial review of the decision, the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." Id. "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion . . . .'" Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005) (quoting Reefer v. Barnhart, 326 F.3d 376, 379 (3d Cir. 2003)). Substantial evidence is "'more than a mere scintilla but may be somewhat less than a preponderance of the evidence.'" Rutherford, 399 F.3d at 552 (quoting Ginsburg v. Richardson, 436 F.2d 1146, 1148 (3d Cir. 1971)). In reviewing the record for substantial evidence, however, this Court must "not 'weigh the evidence or substitute [its own] conclusions for those of the fact-finder.'" Rutherford, 399 F.3d at 552 (quoting Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992)). The substantial evidence standard "is deferential and includes deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence." Schaudeck v. Comm'r of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir.

1999).  Despite the deference given to administrative decisions regarding disability benefits,

reviewing courts "retain a responsibility to scrutinize the entire record and to reverse or remand if

the [Commissioner]'s decision is not supported by substantial evidence."  Morales v. Apfel, 225

F.3d 310, 317 (3d Cir. 2000) (quoting Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981)).

    As for the legal standards applied in the case, this Court's review is plenary.  See Allen

v. Barnhart, 417 F.3d 396, 398 (3d Cir. 2005).

**III.    Discussion**

    **A.    Social Security Disability Evaluation Process**

In considering whether an individual is disabled, the Social Security Administration has

laid down a five-step evaluation process for claimants seeking SSI benefits.  First, the ALJ

considers the claimant's work activity; if the claimant is currently engaging in substantial gainful

activity, the claimant will not be considered disabled.  20 C.F.R. § 404.1520(a)(4)(i) (2008).

Second, the ALJ considers whether the claimant has a "severe impairment" or "combination of

impairments"; where the impairment or combination is not "severe," the claimant is determined

to be not disabled.  20 C.F.R. § 404.1520(a)(4)(ii).  Third, the ALJ then considers whether the

claimant's impairment "meets or equals" one of the pre-approved impairments in the Listing of

Impairments.  20 C.F.R. § 404.1520(a)(4)(iii).  Where the impairment, however, is not pre-

approved, the ALJ next considers whether the claimant's residual functional capacity permits the

claimant to perform any of her past work history; where the claimant can perform any of her

prior jobs, the claimant is not disabled.  20 C.F.R. § 404.1520(a)(4)(iv).  Finally, at the fifth step,

the ALJ considers the claimant's residual functional capacity, age, education, and work

experience to determine whether Plaintiff would be capable of returning to the workforce.  20

C.F.R. § 404.1520(a)(4)(v).  While the claimant has the burden on each of the first four steps, the Commissioner bears the burden of proof on the fifth step.  Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).[3]

   **B.     ALJ Garrety's Findings**

In the ALJ's more recent consideration of Plaintiff's claim for Social Security disability benefits, the ALJ proceeded through the five-step evaluation framework.  First, the ALJ determined that Hoff had not engaged in any substantial gainful activity at any time relevant to the analysis.  (R. 1524).  Next, the ALJ found that Hoff had the following severe impairments: fibromyalgia, degenerative disc disease involving the cervical and lumbar spine, a frozen right shoulder, anxiety, and depression.  (Id.)  However, after considering how those impairments affected her activities, the ALJ concluded that Hoff's impairments did not rise to the level of any of the per se disabilities in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Id.)

Next, the ALJ considered the medical evidence and concluded that Hoff "had the residual functional capacity to perform a range of unskilled, light exertion work, which involves lifting/carrying up to 10 pounds, standing/walking up to 6 hours in an 8-hour day, and the

---

   [3]The regulations for mental impairments further require the Commissioner to record the pertinent symptoms and effect of treatment to determine if an impairment exists.  See 20 C.F.R. § 404.1520a(b)(1) (1999). If an impairment is found, the Commissioner must analyze whether certain medical findings related to the claimant's ability to work exist.  See 20 C.F.R. § 404.1520a(b)(2).  The Commissioner must then rate the degree of functional loss in certain areas relevant to work including daily living, social functioning, concentration, persistence or pace, and deterioration in work-like settings.  See 20 C.F.R. § 404.1520a(b)(3).  If the mental impairment is considered "severe," the Commissioner must determine if it meets a listed mental disorder.  If it is severe but does not meet a listed disorder, the Commissioner must conduct a residual functional capacity assessment.  See 20 C.F.R. § 404.1520a(c)(3).  A Psychiatric Review Treatment Form must be completed at each level of administrative adjudication.  See 20 C.F.R. § 404.1520a(d).

performance of simple and routine tasks.  The claimant is also unable to use her right upper

extremity for over the shoulder reaching or handling."  (Id.)  ALJ Garrety came to this conclusion

upon finding that, while Hoff's impairments "could have been reasonably expected to produce

the alleged symptoms, . . . [her] statements concerning the intensity, duration, and limiting effects

of these symptoms are not entirely credible."  (Id.)

　　　　While the ALJ did not come to any different conclusions than her 2002 opinion

concerning Hoff's physical impairments (R. 1524), she did note that Hoff's mental impairments

mildly interfered with her daily living activities and social functioning and mildly to moderately

interfered with her concentration and ability to keep pace.  (R. 1525).  The ALJ therefore

determined that her mental impairments interfered with her abilities to engage in complex or

detailed tasks, but did not preclude her from engaging in simple and routine tasks for unskilled

work.  (Id.)  Finally, after considering Hoff's residual functional capacity, age, education, and

work experience, the ALJ concluded that there were jobs in significant numbers in the national

economy that Hoff could have performed and she therefore was not disabled.  (R. 1525-26).

### C.　　　Plaintiff's Objections

　　　　Plaintiff raises several objections to the ALJ's analysis and conclusions.  First, Plaintiff

argues that the ALJ erred by failing to request the testimony of a medical expert to determine

whether Hoff's impairment amounted to a per se disability.  Second, Plaintiff argues that the ALJ

erred by failing to rule that Hoff's bilateral knee injury was a severe impairment.  Third, Plaintiff

argues that the ALJ erred by concluding that Hoff had the residual functional capacity of

performing a range of light work, and such a conclusion is not supported by substantial evidence.

Fourth, Plaintiff argues that the ALJ erred when she failed to investigate the types and levels of

job stresses involved in those jobs identified by the vocational expert that Hoff could have

engaged in.  Finally, Plaintiff argues that the ALJ's conclusion that Hoff's statements concerning

the extent of her impairments were not credible was not supported by substantial evidence.

**D.     ALJ's Determination of Plaintiff's Residual Functional Capacity**

Plaintiff argues that the ALJ's determination that she had the residual functional capacity

(hereinafter "RFC")  to perform a range of light work was not supported by substantial evidence.

Specifically, the ALJ stated that Plaintiff could do work involving lifting and carrying up to ten

pounds, standing or walking up to six hours in an eight-hour work day, and the performance of

simple, routine tasks.  (R. 1524.)  The ALJ also noted Plaintiff's inability to use her right upper

extremity for over the shoulder reaching and handling.  (Id.)  Plaintiff asserts that she is not able

to stand or walk for up to six hours.  In addition, Plaintiff claims that her right shoulder injury

limits her ability to lift up to ten pounds.

1.     Conflicting Medical Evidence

Plaintiff cites the records of two treating physicians that specifically address her RFC.

First, Dr. Stollsteimer, the orthopedic surgeon who performed surgery on her right shoulder due

to her work-related injury, specifically addressed when she could return to work following her

surgery on July 15, 1999.  On July 19, 1999, Dr. Stollsteimer stated that "[w]e will keep her off

of duty, at this point, and in the future slowly return her to light duty as she is able."  (R. 1612.)

Dr. Stollsteimer continued to believe she was not ready to return to normal work during the

summer and early fall of 1999.  (R. 1611, 714, 353.)  On November 17, 1999, Dr. Stollsteimer

authorized physical release of Plaintiff to perform "sedentary" work, described as lifting ten

pounds and sitting with some walking and standing.  (R. 703.)  The doctor specified that Plaintiff

could stand or walk one to four hours in an eight-hour day, sit three to five hours per day, and could not drive.  (Id.)  Additionally she could perform simple grasping.  (Id.)

ALJ Garrety did not mention Dr. Stollsteimer's treatment of Plaintiff in either her 2002 or 2006 opinion.  (R. 16-21; 1521-26.)  Instead, the ALJ notes that a Dr. O'Donnell stated Plaintiff's impairment would restrict her to light work which did not involve use of the right upper extremity.  (R. 17.)  The Court could not find such a statement by O'Donnell or another doctor anywhere in the record.  Instead, the only medical report from O'Donnell involved foot injuries complained of by Plaintiff in November 1998.  (R. 1078.)  In addition, none of the independent medical exams (hereinafter "IME"), which reviewed Plaintiff's prior medical records, noted treatment by Dr. O'Donnell for her shoulder injury.  (See R. 566-67, 1700-06, 1770-84.)  Therefore, the ALJ's reliance on this fact is unfounded.

Second, Dr. Katz treated Plaintiff for her widespread pain syndrome beginning September 27, 2000.  Katz continued to treat Plaintiff for her pain every few months through 2002 and again in 2006.  (R. 1636.)  On March 20, 2006, he completed a Fibromyalgia RFC Questionnaire, and he stated that the restrictions that he identified applied back to September 27, 2000, when he first saw Plaintiff.  (R.1639.)  In the questionnaire, he stated that Plaintiff met the criteria for fibromyalgia, sacroiliitis, and neurally mediated hypotension and that Plaintiff was not a malingerer.  (R. 1636.)  Katz stated that Plaintiff experienced pain severe enough to interfere with attention and concentration constantly and was moderately limited in her ability to deal with work stress.  (R. 1637.)  Katz concluded that Plaintiff could sit and stand or walk less than two hours in an eight-hour work day.  He said that Plaintiff could occasionally lift and carry less than ten pounds and had significant limitations in doing repetitive reaching, handling, or fingering.

-15-

(R.1639.)  Katz stated that Plaintiff would need to take constant unscheduled breaks, could not

walk a single block without rest or severe pain, and, in conclusion, "cannot work."  (R.1638.)

Finally, Katz stated that Plaintiff would be absent from work as a result of impairments or

treatment more than three times a month.  (Id.)  The ALJ never made reference to Katz's recent

2006 RFC in her 2006 opinion.

In addition to the two treating physicians' findings relied on by Plaintiff in her Motion,

Dr. O'Brien stated that he did not believe Plaintiff could work in November 1999 and could not

return to her prior job consistently throughout the period for which she is eligible for disability.

(R. 528-40, 1160.)  Further, an IME for the purpose of workers' compensation performed by Dr.

Bosacco on December 11, 2006 found that Plaintiff was at maximum medical improvement from

her 1999 work injury.  At this level of maximum improvement, he concluded that she was

capable of "a sedentary light duty position with restricted usage of the right upper extremity."

(R. 1704.)  Bosacco stated that Plaintiff could stand, sit/stand, walk, and drive three to five hours

in an eight-hour day, and sit five to eight hours.  He stated that she could not firmly grasp with

her right arm but could lift and carry ten pounds.  (R. 1705.)

However, other assessments found that Plaintiff was less limited than stated by her

treating physicians and Bosacco's IME.  A physical RFC assessment by a Department of Social

Services doctor performed January 30, 2001 stated that Plaintiff could lift and/or carry ten

pounds and could stand and/or walk and sit about six hours in an eight-hour workday.  (R. 1013.)

The assessment stated that Plaintiff could drive, take public transportation, and care for her pets

and family, such that her functioning was not severely limited.  (R.1017.)

In addition to the RFC assessment, an IME for the purpose of workers' compensation performed by Dr. Meller on December 4, 2000 did not find that any of Plaintiff's complaints were related to her work injury and found that she required no further treatment for that injury. (R. 1784.)  Meller stated that Plaintiff could return to her pre-injury occupation without any restrictions.  (Id.)  He further described that Plaintiff's injuries were due to symptom embellishment and self-limiting behavior.  (R. 1783.)  An additional IME for the purposes of workers' compensation performed May 26, 2000 by Dr. Levin also found that Plaintiff did not require care or treatment for any injuries except possibly for her right shoulder.  (R. 566-85.) Levin harshly criticized treatment by Dr. O'Brien and Dr. Landes as unnecessary and "reinforc[ing] her invalid status."  (R. 584.)  Yet a Utilization Review requested by the Bureau of Workers' Compensation in February 2000 found that O'Brien's treatment was reasonable and necessary.  (R. 648-57.)

2.      Standard for Evaluating Medical Evidence

The ALJ is required to evaluate every medical opinion received.  20 C.F.R. § 404.1527(d). The Court of Appeals for the Third Circuit set forth the standard for evaluating the opinion of a treating physician in the case of Morales, 225 F.3d 310. The court stated: "A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'"  Id. at 317 (quoting Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir.1999)); see also Rocco v. Heckler, 826 F.2d 1348, 1350 (3d Cir. 1987).  The court went on to say that where the opinion of a treating physician conflicts with that of a non-treating physician, "the ALJ may choose whom to

credit but 'cannot reject evidence for no reason or for the wrong reason.'" <u>Morales</u>, 225 F.3d at

317 (quoting <u>Plummer</u>, 186 F.3d at 429).  The ALJ must consider the treating physician's

assessment, and in choosing to reject it, "an ALJ may not make 'speculative inferences from

medical reports' and may reject 'a treating physician's opinion outright only on the basis of

contradictory medical evidence' and not due to his or her own credibility judgments, speculation

or lay opinion."  <u>Morales</u>, 225 F.3d at 317 (quoting <u>Plummer</u>, 186 F.3d at 429).  A treating

physician's opinion will be afforded "more or less weight depending upon the extent to which

supporting explanations are provided." <u>Plummer</u>, 186 F.3d at 429.   Finally, where there is

conflicting evidence, the ALJ must not only discuss the evidence that supports his or her

determination but also must explain the evidence that he or she rejects.  <u>Cotter v. Harris</u>, 642

F.2d 700, 705 (3d Cir. 1981) (quoting <u>Dobrowolsky v. Califano</u>, 606 F.2d 403 (3d Cir. 1979));

<u>see also</u> <u>Wisniewski v. Comm'r Social Sec.</u>, 210 Fed.Appx. 177 (3d Cir. 2006) (clarifying

<u>Cotter</u>).

### 3.      ALJ's Rejection of the Medical Evidence

Contrary to her legal obligation, ALJ Garrety failed to address or explain why she did not

credit Dr. Stollmeister, Dr. Katz, and Dr. O'Brien's assessment of Plaintiff's RFC, and instead

relied on her own credibility assessment of Plaintiff in determining her RFC.  Neither of her

opinions take note of these doctor's findings described above.  In her 2002 opinion, ALJ Garrety

dedicated five brief paragraphs to summarizing some of Plaintiff's treating physicians and

ailments.  (R. 17.)  In her 2006 opinion, Garrety did not summarize the medical evidence,

including updated evidence such as Katz's RFC, and instead merely adopted and incorporated

her summary and analysis of the evidence in her 2002 opinion.  (R. 1521.)  Contrary to the

cursory treatment that the ALJ afforded the evidence, the record contains 1,800 pages, including medical reports and diagnoses by doctors never even mentioned by the ALJ.  Although the ALJ does not have to make reference to every treatment note in a case involving a voluminous record such as this, the ALJ, as factfinder, must consider and evaluate the medical evidence in the record consistent with her legal responsibility.  See Fargnoli v. Massanari, 247 F.3d 34, 42 (3d Cir. 2001).

Instead of relying on the documented medical evidence, the ALJ in 2002 assessed Plaintiff's RFC based on her determination that Plaintiff's testimony was "generally credible but not consistent with wholly work-preclusive functional limitations."  (R. 20.)[4]  Furthermore, the ALJ made this finding by appearing to rely exclusively on Plaintiff's level of daily activity in her home.  (R. 18 ("Although claimant has testified to disabling levels of pain and fatigue, she has remained very active despite her impairments."))  The ALJ makes much of the fact that Plaintiff cooks, cleans, shops for groceries, prepares meals for her family, and does other care-taking activities.  Such evidence may be considered in assessing the credibility of a claimant's statements.  S.S.R. 96-7p, 1996 WL 374186, at *3.  But case law states that such activities do not preclude a finding of disability where the medical evidence supports a disabled finding.  See, e.g., Smith, 637 F.2d at 971 ("[S]hopping for the necessities of life is not a negation of disability"); see also Lozado v. Barnhart, 331 F.Supp.2d 325, 338 (E.D. Pa. 2004) (distinguishing

---

[4]The ALJ's 2006 opinion also found that Plaintiff's impairments "could have been reasonably expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, duration, and limiting effects of these symptoms are not entirely credible."  (R. 1524.)  To support this statement, the ALJ refers to her summary and analysis of the evidence in her 2002 opinion, so this Court will further examine the reasoning contained only in the initial opinion.

Smith where the ALJ discussed that the record of medical evidence did not support claimant's disability status).  As stated by the Third Circuit, "[d]isability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity."  Smith, 637 F.2d at 971.

In a case where the ALJ's opinion relied on similar facts as the instant case, the district court reversed the ALJ and awarded the plaintiff benefits where the ALJ noted the following facts to deny benefits: plaintiff shopped for groceries, cleaned her house, did laundry, washed the dishes, cooked, drove her car, played cards and billiards, watched television, listened to music, went for walks, visited relatives, and read.  Rieder v. Apfel, 115 F.Supp.2d 496, 504 (M.D. Pa. 2000).  The court in that case noted, "the law does not require a complete restriction from recreational and other activities as a prerequisite to a finding of disability."  Id. at 504-05 (citing Smith, 637 F.2d at 968; Wright v. Sullivan, 900 F.2d 675 (3d Cir. 1990)).

Even though Plaintiff does perform household activities, unlike a working environment, these tasks can be performed at her own pace with adjustment for her limitations.  Plaintiff testified that many of the activities of daily life cited by the ALJ are painful for her and that she sometimes must take breaks in order to complete them.  (R. 1496-98, 1500-06 (describing Plaintiff's difficulty climbing stairs, grocery shopping, driving, doing laundry, vacuuming, paying bills, and playing the organ).)  She also testified at her 2006 hearing that in 1999 and 2000 she could only stand for half an hour at a time and walk about a block.  (R. 1790-91.)  Plaintiff stated that she had to quit singing in the church choir, something she previously enjoyed, because of her loss of focus and concentration.  (R. 1793.)  In addition to Plaintiff's household activities, the ALJ relied in part on Plaintiff's recent trip to Hawaii and visit to her mother in a nursing

home prior to her death.  However, "sporadic and transitory activities cannot be used to show an ability to engage in substantial gainful activity."  Fargnoli, 247 F.3d 34, 40 n.5; see also Smith, 637 F.2d at 971.

As Defendant argues, in addition to relying on Plaintiff's level of daily activity, the ALJ noted in discussing Plaintiff's treatment with Dr. Katz that Katz reported improvement in Plaintiff's condition in December 2000, the last month for which Plaintiff is eligible for benefits. (R. 17.)  Katz did note on December 1, 2000 that Plaintiff's pain syndrome was improving.  (R. 1422.)  However, in the same medical report, Katz stated that Plaintiff was still feeling extremely tired and experiencing persistent generalized muscle spasms and achiness, perhaps consistent with restless leg syndrome.  (Id.)  In addition, Katz continued to treat Plaintiff throughout 2001 for her pain symptoms, so her condition had not in fact improved substantially.  (R. 1424-34.) Katz's 2006 RFC report did not note any improvement in Plaintiff's condition during the period that he treated her.  Even where a claimant's condition is improved, a doctor's observation that a patient is "stable and well controlled with medication during treatment does not [necessarily] support the medical conclusion that [the patient] can return to work."  Morales, 225 F.3d at 319. Based on the continued treatment that Plaintiff received after December 2000 from Katz and other treating physicians, her condition could not be described as "stable and well controlled."

Defendant also contends that Katz's RFC should not be credited because Katz's report only applies to three months of Plaintiff's eligibility period—September 27 to December 31, 2000.  The Court acknowledges that Katz did not begin to treat Plaintiff until the last three months of her eligibility period.  However, Defendant's argument that Katz's report establishes a disability only for three months and therefore does not meet the durational requirement required

by the regulations must fail.  The durational requirement that an impairment must last or be expected to last for a continuous period of twelve months applies to step two of the disability determination process in determining the existence of a severe impairment.  See 20 C.F.R. § 404.1520(a)(4)(ii), which the ALJ conclusively found (R. 1524).  There is no durational requirement in considering evidence of a Plaintiff's RFC.  See 20 C.F.R. § 404.1520(a)(4)(v).  Therefore, Katz's RFC Report may be credited in as much as it establishes physical limitations beginning September 27, 2000.

### 4.      Court's Assessment of the Record Evidence

Based on the above legal standard, this Court is persuaded that Plaintiff's treating physicians' assessments of her ability to perform job-related tasks are supported by substantial evidence.  Doctors Stollsteimer, Katz, and O'Brien treated Plaintiff over a series of months and years.  Their assessments of Plaintiff's physical limitations are therefore based on multiple observations and a significant history with the patient versus a one-time evaluation for the purposes of a government benefits determination.  Their reports are consistent that Plaintiff can only sit, stand, or walk less than six hours in an eight-hour day, and Bosacco's IME confirms this finding except for sitting (Bosacco states that Plaintiff could sit five to eight hours per day).  All four doctors also state that Plaintiff can lift and or carry no more than ten pounds.

Based on the Third Circuit standard in Plummer, the treating physician's assessments are extensive and well-documented with supporting treatment records and therefore should be accorded great weight.  186 F.3d at 429; see also Curry v. Barnhart, 247 F.Supp.2d 632, 635 (E.D. Pa. 2003) ("A treating physician's opinion will be given 'controlling weight,' if 'well

supported' by clinical and diagnostic techniques." (citing 20 C.F.R. §§ 404.1527, 416.927)).  Dr. Stollsteimer, O'Brien, and Katz all reviewed numerous symptoms complained of by Plaintiff over time, performed multiple and evolving diagnoses, tried various treatment methods, and relied on technical evaluation techniques such as MRIs and lab tests.  The Court is also persuaded by the fact that all of Plaintiff's treating physicians who did such evaluations of Plaintiff are in agreement that Plaintiff does not have the RFC to do light work, as the standard is explained infra.  See Brownawell v. Comm'r Social Sec., 2008 WL 5147953 (3d Cir. Dec. 2, 2008) (awarding disability benefits where the plaintiff's treating physician considered her disabled).

The treating physicians assessments cover the entirety of the period for which Plaintiff is eligible for disability benefits.  Dr. Stollsteimer's found Plaintiff unable to work from the time of the alleged onset of disability through November 1999 and then assessed her as being able to perform sedentary work.  Dr. O'Brien deemed Plaintiff unable to work in a November 1999 letter and unable to return to her prior job from September 1999 to September 2000.  Dr. Katz found that Plaintiff was unable to work beginning September 2000.

By contrast, the contervailing RFC assessment and IMEs do not constitute equally reliable evidence.  Where "residual functional capacity reports are unaccompanied by thorough written reports, their reliability is suspect, especially when they conflict with the reports of the claimant's treating physician."  Brewster v. Heckler, 786 F.2d 581, 585 (3d Cir. 1986).  Here, the Department of Social Service's RFC assessment did not thoroughly review Plaintiff's symptoms or diagnoses and provided no substantiation for its findings besides filling out an RFC form.  The assessment, like the ALJ, discussed Plaintiff's ability to do daily activities instead of discussing

-23-

her medical history.  (R. 1017.)  In addition, the IMEs that found Plaintiff could return to work with no restrictions were performed for the purpose of workers' compensation and were therefore focused solely on Plaintiff's work-place shoulder injury, not on her overall disability assessment based on the multiple impairments found by the ALJ.  While both reports appear to have included an actual physical examination of Plaintiff, as opposed to merely reviewing her records, a brief examination for the purpose of government benefit eligibility is not as credible or well-substantiated as a long-time treating physician.  See Morales, 225 F.3d at 317; Curry, 247 F.Supp.2d at 634 ("An ALJ must accord significant deference to an assessment by a claimant's treating physician.").

Taking Plaintiff's treating physician's assessments of her capabilities into account, the vocational expert (VE) at Plaintiff's 2006 ALJ hearing testified that Plaintiff would be found disabled.  In considering Katz's RFC Report, the VE answered that a person "would be unable to work" if they possessed the limitations on her hands that Katz described Plaintiff as possessing. (R. 1798.)  Additionally, the VE agreed that where a person would miss more than three days of work a month for health reasons, as Katz stated Plaintiff would, they would be fired.  (R. 1799.) The VE concluded that "if the judge finds this form as completed by the doctor, Dr. Katz, to be supported by the evidence it would result in unemployability."  (Id.)  Additionally, the VE stated that if Landes's psychological evaluation of Plaintiff were credited, Plaintiff would be unemployable.  (R. 1800.)

---

### 5.     Disability Finding According to the Medical-Vocational Guidelines

However even if the exact limitations described in Katz's RFC were not credited, Plaintiff is disabled according the to the medical-vocational guidelines or "grids" contained in Appendix 2 of the regulations.  See 20 C.F.R. pt. 404, subpt. P, app. 2.  The grids are rules used to direct conclusions of "disabled" or "not disabled" based on a claimant's vocational factors (age, education, and work experience) and exertional RFC (sedentary, light, medium, heavy, or very heavy).  Martin v. Barnhart, 240 Fed.Appx. 941, 944 (3d Cir. 2007) (citing 20 C.F.R. pt. 404, subpt. P, app. 2 § 200.00(a)).  Where a claimant can perform all or substantially all of the exertional demands at a given level of exertion, the grids direct a disability finding.  (R. 1525.) But where an individual's vocational profile does not fully coincide with a grid rule or where the claimant has non-exertional limitations and claimant's exertional limits do not by themselves direct a conclusion of disabled, the grids merely serve as a frame of reference.  (Id. (citing S.S.R. 83-12, 83-14))

The ALJ determined that Plaintiff had the RFC to perform light work, with restrictions on the use of her upper right extremity and the complexity of tasks.  The full range of light work requires standing or walking for approximately 6 hours of an 8-hour workday.  S.S.R. 83-10, 1983 WL 31251, at *5.  Light work also requires lifting no more than twenty pounds at a time and frequently lifting or carrying up to ten-pound objects.  Id.  However, of the four RFC assessments in the record, three conclude that Plaintiff can only walk or stand between two and five hours in an eight-hour day, sit between two to eight hours in an eight-hour day, and lift up to ten pounds; Plaintiff's treating physicians estimates were on the low end of these estimates.

This record indicates that Plaintiff can not perform substantially all of the primary strength activities defining the light work exertional level, as required by the Social Security regulation governing use of the grids.  Id. at * 2.  Therefore, this Court determines that Plaintiff can not perform light work and, as stated by her treating physicians, has an RFC of sedentary work.  Sedentary work involves lifting no more than ten pounds at a time with occasional standing or walking totaling about two hours of an eight-hour workday and sitting approximately six hours of an eight-hour day.  Id. at *5.  Although some of the RFCs stated that Plaintiff could sit, stand and, walk slightly more hours than the definition of sedentary work, the Plaintiff's treating physician's RFCs exhibit that her exertional capacity is "significantly reduced" from the light work definition and indicates "little more than the occupational base for the lower rule" of sedentary work, as described in Social Security Ruling 83-12, instead of falling "in the middle" of the sedentary and light work categories (which suggests the need for VE testimony).  S.S.R. 83-12, 1983 WL 31253, at *3 (describing adjudicative guidelines for how to assess RFC where an exertional level falls between two rules that direct opposite conclusions between disabled and not disabled).

The ALJ made specific findings as to the rest of Plaintiff's vocational profile.  Plaintiff was 51 years old at the date of the onset of her disability, so she was "closely approaching advanced age."  (R. 20.)  Plaintiff had a tenth grade education, no transferable job skills, and was limited to unskilled work.  (R. 20, 1525)  Based on her RFC of sedentary work, Plaintiff is disabled according to Grid Rule 201.09.  20 C.F.R. pt. 404, subpt. P, app. 2; see also S.S.R. 96-6p, 1996 WL 374185, at *3 ("For the majority of individuals who are age 50 or older and who are limited to the full range of sedentary work by their medical impairments, the rules and

guidelines in appendix 2 require a conclusion of 'disabled.'")

      **E.**      **District Court's Ability to Award Benefits**

      This court has the ability, when it determines that the ALJ's decision is not supported by substantial evidence, to reverse and direct an award of benefits.  Allen v. Bowen, 881 F.2d 37, 43 (3d Cir. 1989) (citing Podedworny v. Harris, 745 F.2d 210, 221 (3d Cir. 1984)).  The district court should award benefits only when "the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits."  Podedworny, 745 F.2d at 221-22.  "When faced with such cases, it is unreasonable for a court to give the ALJ another opportunity to consider new evidence concerning the disability because the administrative proceeding would result only in further delay in the receipt of benefits."  Id. at 222; see also Morales, 225 F.3d at 320 (awarding benefits where there was substantial evidence of plaintiff's disability and the case had involved considerable inexplicable delay that was not the fault of the claimant).

      In this case, the record has been fully developed over eight years of applications and appeals and is unlikely to change.  See Brownawell, 2008 WL 5147953 (awarding benefits where Plaintiff filed her claim eight years ago, had two hearings by an ALJ, two petitions to the Appeals Council, and two appeals to the district court).  It contains substantial medical evidence and testimony from Plaintiff, her treating physicians, vocational experts, and additional relevant parties.  Based on the above analysis, there exists substantial evidence to establish Plaintiff's disability.  Because Plaintiff has exhaustively pursued her claim, this Court sees no reason for a remand.  It will therefore award benefits to Plaintiff for the relevant period of eligibility.

F.        Plaintiff's Remaining Objections

Based on this finding, this Court will not consider Plaintiff's additional four objections.

However, the Court wishes to note that it also found Plaintiff's arguments relating to the ALJ's

failure to request a testifying medical expert on Plaintiff's mental impairment highly persuasive.

Plaintiff previously raised the issue of medical expert testimony at previous stages of the

appeal of her claim (R. 1802-03) and wrote a separate letter to ALJ Garrety on January 11, 2006,

in advance of the second hearing, specifically asking that a psychiatrist be called to testify.  (R.

1570.)  Although an ALJ's decision to seek testimony from a medical expert is discretionary, see

20 C.F.R. § 404.1527(f)(2)(iii), where the record is inconclusive as to whether claimant's

impairment is equivalent to a pre-approved impairment, a medical expert should examine the

impairment.  Diehl v. Barnhart, 357 F.Supp.2d 804, 815 (E.D. Pa. 2005); see also Maniaci v.

Apfel, 27 F.Supp.2d 554, 557 (E.D. Pa. 1998).

Here Plaintiff's treating psychologist, Dr. Landes, described Plaintiff as having significant

mental impairments that precluded work and other activities.  (R. 914, 1478, 1480.)  By contrast,

an independent evaluation of Plaintiff in March 2000 found that she was not disabled on a

psychiatric basis (R. 633) and a mental RFC assessment performed in January 2000 found that

Plaintiff did not possess severe functional limitations and could perform low-stress, unskilled

work activities (R. 994).  This conflicting medical evidence should have been analyzed by the

ALJ and suggests that a medical expert should have testified.  Instead, the ALJ discounted

Plaintiff's treatment with Landes and pointed to Plaintiff's wide variety of daily activities in

finding that Plaintiff was only mildly to moderately mentally impaired.  (R. 1525.)  The Court

notes this argument but since it will award benefits based on Plaintiff's physical impairments and RFC, it is not necessary to remand for medical testimony on Plaintiff's mental impairments.

**IV.     Discussion**

For the foregoing reasons, Plaintiff's Motion for Summary Judgment is granted, the decision of the Commissioner is reversed, and benefits are awarded to Plaintiff.

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CAROL A. HOFF | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| MICHAEL J. ASTRUE, | : | NO. 08-cv-0218 |
| COMMISSIONER OF THE | : | |
| SOCIAL SECURITY ADMINISTRATION_: | | |

## ORDER

AND NOW, this     29th     day of January, 2009, upon careful and independent

consideration of Plaintiff Carol A. Hoff's Motion for Summary Judgment, and review of the

record, it is hereby ORDERED that:

(1)     Plaintiff's Motion (Doc No. 8) is GRANTED;

(2)     The Commissioner's decision of April 25, 2006 is REVERSED;

(3)     The Commissioner shall AWARD Plaintiff the disability benefits to which she is

entitled for the period of July 15, 1999 to December 31, 2000; and

(4)     The clerk shall mark this case CLOSED for statistical purposes.

BY THE COURT:

/s Michael M. Baylson

_____

Michael M. Baylson, U.S.D.J.

O:\CIVIL 07-08\08-218 Hoff v. Astrue\Hoff Memo.wpd